1  Kenneth J. Nolan, Esq. (FL SBN 603406)
   ken@whistleblowerfirm.com
2  Marcella Auerbach, Esq. (FL SBN 249335)
   marcella@whistleblowerfirm.com
3  Joseph E.B. White, Esq. (PA SBN 203475)
   jeb@whistleblowerfirm.com
4  **NOLAN AUERBACH & WHITE, P.L.**
   435 North Andrews Avenue, Suite 401
5  Fort Lauderdale, FL 33301
   Telephone: (954) 779 3943
6  Facsimile: (954) 779-3937

7  David I. Weissman, Esq. (AZ SBN 027042)
   dweissman@roselawgroup.com
8  Christopher B. Ingle, Esq. (AZ SBN 025553)
   cingle@roselawgroup.com
9  **ROSE LAW GROUP PC**
   7144 E. Stetson Drive, Suite 300
10 Scottsdale Arizona 85251
   Telephone: (480) 505-3936
11 Facsimile: (480) 505-3925

12 *Attorneys for Plaintiff Relator*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FILED ___ LODGED
___ RECEIVED ___ COPY

DEC 1 2 2014

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

CV-14-02674-PHX-PGR

**SEALED**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* KATHLEEN HAWKINS <br><br> Plaintiff and Relator, <br><br> v. <br><br> TENET HEALTHCARE CORPORATION; VANGUARD HEALTH FINANCIAL COMPANY LLC d/b/a VANGUARD HEALTH SYSTEMS d/b/a ABRAZO HEALTH; VHS ACQUISITION SUBSIDIARY NUMBER 1, INC. d/b/a PARADISE VALLEY HOSPITAL;  VHS ACQUISITION CORPORATION d/b/a MARYVALE HOSPITAL; VHS OF ARROWHEAD, INC. d/b/a ARROWHEAD HOSPITAL; HOSPITAL DEVELOPMENT OF WEST PHOENIX, INC. d/b/a WEST VALLEY HOSPITAL; VHS OF PHOENIX, INC. d/b/a PHOENIX BAPTIST HOSPITAL; and ARIZONA HEART HOSPITAL, LLC d/b/a ARIZONA HEART HOSPITAL <br><br> Defendants. | Civil Action No.: <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) AND LOCAL RULE 5.7** <br><br> **FALSE CLAIMS ACT COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

---

FALSE CLAIMS ACT COMPLAINT

1

**INTRODUCTION**

1.      KATHLEEN HAWKINS ("Relator") brings this action on behalf of the UNITED STATES OF AMERICA against TENET HEALTHCARE CORPORATION; VANGUARD HEALTH FINANCIAL COMPANY LLC d/b/a VANGUARD HEALTH SYSTEMS SUBSIDIARY NUMBER 1, INC. d/b/a PARADISE VALLEY HOSPITAL; VHS ACQUISITION CORPORATION d/b/a MARYVALE HOSPITAL; VHS OF ARROWHEAD, INC. d/b/a ARROWHEAD HOSPITAL; HOSPITAL DEVELOPMENT OF WEST PHOENIX, INC. d/b/a WEST VALLEY HOSPITAL; VHS OF PHOENIX, INC. d/b/a PHOENIX BAPTIST HOSPITAL; and ARIZONA HEART HOSPITAL, LLC d/b/a ARIZONA HEART HOSPITAL, for treble damages and civil penalties arising from the Defendants' conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"). The violations arise out of requests for payment by Medicare, Medicaid, and other government agencies and programs (hereinafter, collectively the "Government Healthcare Programs") based on false claims.

2.      Defendants knowingly failed to be the medical necessity gatekeepers of their own hospital doors, resulting in increased costs to Government Healthcare Programs and increased harm to patients. In doing so, Defendants submitted false and non-covered, medically unnecessary claims to Government Healthcare Programs for inpatient admissions. Further Defendants knowingly submitted claims for 100% medically unnecessary procedures and services, including cardiac and carotid stent procedures, solely for financial gain.

3.      Defendants are diverting scarce health care dollars into their own pockets by billing for many inpatient services that should be provided on an outpatient basis. Defendants are also endangering the patients they serve. Hospitalization poses significant physical and psychological risks to patients. The elderly are particularly susceptible to hospital-acquired infections, adverse drug reactions and hospital delirium; they should be hospitalized <u>only</u> when their medical needs cannot be adequately addressed elsewhere.

4.      Relator is informed and believes that the false claims described herein began at least six (6) years before the filing of Relator's Complaint, and some continue to date.

## FEDERAL JURISDICTION AND VENUE

5.      The acts proscribed by 31 U.S.C. §3729 *et seq.* and complained of herein occurred in part in the District of Arizona, and several of the Defendants do business in the District of Arizona. Therefore, this Court has jurisdiction pursuant to 31 U.S.C. § 3732 (a), as well as under 28 U.S.C. § 1345, and 28 U.S.C. § 1331.

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because one or more Defendants reside in this District, and one or more Defendants transact business in this District.

7.      The facts and circumstances which give rise to Defendants' violation of the False Claims Act have not been publicly disclosed in a criminal, civil, or administrative hearing, nor in any congressional, administrative, or General Accounting Office report, hearing, audit, or investigation, nor in the news media.

8.      Relator is the original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act and other laws at issue herein.

## PARTIES

9.      Relator, Kathleen Hawkins, is a resident of the State of Arizona.

10.     Defendant, Tenet Healthcare Corporation ("Tenet"), is a Nevada for-profit corporation with its principal place of business in Dallas, Texas. As of December 31, 2013, Tenet operated 77 hospitals, 183 outpatient centers, six health plans, and six accountable care networks. Tenet acquired Defendant Vanguard in or about October 1, 2013, and it has been a subsidiary of Tenet since then.

11.     Defendant, Vanguard Health Financial Company, LLC d/b/a Vanguard Health Systems, d/b/a Abrazo Health ("Vanguard"), is a Delaware corporation with its principal place of

business located in Nashville, Tennessee. It was acquired by Tenet on or around October 1, 2013, and since then, is a subsidiary of Tenet. Its Arizona facilities at all material times are known collectively as "Abrazo Health," and are: Arizona Heart Hospital, Arrowhead Hospital, Paradise Valley Hospital, Maryvale Hospital, Phoenix Baptist Hospital, and West Valley Hospital (hereinafter when referred to collectively as the "Defendant Hospitals" or "Abrazo Health hospitals").

12.     Each Abrazo Health hospital is individually incorporated as follows:

     a.  Defendant VHS Acquisition Subsidiary Number 1, Inc. d/b/a Paradise Valley Hospital ("Paradise") is a Delaware corporation registered to conduct business in Arizona. It is a wholly-owned subsidiary of Vanguard.

     b.  Defendant VHS Acquisition Corporation d/b/a Maryvale Hospital ("Maryvale") is a Delaware corporation registered to conduct business in Arizona. It is a wholly-owned subsidiary of Vanguard.

     c.  Defendant VHS of Arrowhead Inc. d/b/a Arrowhead Hospital ("Arrowhead") is a Delaware corporation registered to conduct business in Arizona. The hospital is an affiliate of Abrazo Health Care, as of 1999, and is a wholly-owned subsidiary of Vanguard.

     d.  Defendant Hospital Development of West Phoenix, Inc. d/b/a West Valley Hospital ("West Valley") is a Delaware corporation registered to conduct business in Arizona and is a wholly-owned subsidiary of Vanguard.

     e.  Defendant VHS of Phoenix Inc. d/b/a Phoenix Baptist Hospital ("Phoenix Baptist") is a Delaware corporation registered to conduct business in Arizona and is a wholly-owned subsidiary of Vanguard.

     f.  Defendant Arizona Heart Hospital, LLC d/b/a Arizona Heart Hospital ("Arizona Heart") is an Arizona limited liability company. Arizona Heart is a subsidiary of VHS of Phoenix Inc., and since 2010, a subsidiary of Vanguard.

## THE FALSE CLAIMS ACT

13.     The False Claims Act provides, in pertinent part that:

> (a) Any person who (1) knowingly presents, or causes to be
> presented, to an officer or employee of the United States
> Government or a member of the Armed Forces of the United
> States a false or fraudulent claim for payment or approval; (2)
> knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or
> approved by the Government; (3) conspires to defraud the
> Government by getting a false or fraudulent claim paid or
> approved by the Government;
>
> &#42; &#42; &#42;
>
> is liable to the United States Government for a civil penalty of
> not less than $5,000 and not more than $10,000, plus 3 times
> the amount of damages which the Government sustains
> because of the act of that person.

31 U.S.C. § 3729.

14.     The False Claims Act is the government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States.  See S.  Rep.  No.  345, 99 Cong., 2nd Sess. at 2 (1986) reprinted in 1986 U.S.C.C.A.N 5266.

## GOVERNMENT HEALTHCARE PROGRAMS REIMBURSEMENT

### Medicare

15.     Medicare is a federally funded health insurance program primarily for the elderly. Medicare was created in 1965 in Title XVIII of the Social Security Act. Medicare has several parts including: Part A, the Basic Plan of Hospital Insurance, which covers the cost of hospital services and related ancillary services; and Part B, which covers the cost of physicians' services hospital outpatient services and other ancillary services not covered by Part A.

16.     Medicare Part A covers the cost of hospital services and related care, and reimburses hospitals for services provided to its beneficiaries by means of a prospective payment system ("PPS").

17.     Under the PPS, Medicare pays a fixed amount of money for hospital admissions of Medicare beneficiaries determined by the Diagnostic Related Group (DRG) into which the beneficiaries fall. This means that a pre-determined, fixed and set all or nothing Medicare payment is made to hospitals based on the DRG assigned to the specific beneficiary so long as the hospital admission is medically necessary.

18.     The Medicare program assigns DRG's a particular weight by which a uniform federal rate is multiplied. The more complicated and costlier the treatment is, the greater the weight to be assigned to that particular DRG. Under the PPS, to calculate the final DRG prospective payment rate for a patient discharged, the Secretary of Health and Human Services takes the federal rate, adjusted according to a locality-based wage index, and then multiplies it by the weight assigned to the patient's DRG. By statutory mandate, the Secretary must publish the weights and values that are to be factored into the prospective payment calculus before each fiscal year. See 42 U.S.C. § 1395ww(d)(6).

19.     Under Medicare Part A, hospitals submit claims for payment for inpatient services after the patient has been discharged from the hospital. Initially, hospitals submit a patient-specific claim for interim payment for each discharged Medicare patient on Form CMS-1450, also called Form UB-04.

20.     Hospitals submit patient-specific claims for outpatient services under Medicare Part B. Medicare uses Ambulatory Payment Classifications ("APCs") to determine reimbursement rates for hospital outpatient services. Under the APC system, outpatient services provided to a patient are assigned to a "classification" and reimbursed at a rate set by Medicare for that classification. More complex services are assigned to classifications with higher reimbursement rates. The number of diagnostic tests ordered may influence the classification of hospital outpatient services provided in the ER, and hence the reimbursement rate.

21.     In addition to these interim patient-specific claims, hospitals annually submit Form CMS-2552, commonly known as the Hospital Cost Report. 42 U.S.C. §1395g(a); 42 C.F.R. §

413.20. The cost report is the provider's final claim for payment from the Medicare program for the services rendered to all program beneficiaries for a fiscal year. Medicare relies on the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

### Medicaid

22.     Medicaid was also created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program. Thus, under Title XIX of the Social Security Act ("Medicaid"), 42 U.S.C. § 1396 et seq., federal money is distributed to the states, which in turn provide certain medical services to the poor.

23.     Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid program.  The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of the United States Department of Health and Human Services ("the Secretary").  After the Secretary approves the plan submitted by the State, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of "medical assistance" under the plan. 42 U.S.C. § 1396b(a)(1). This reimbursement is called "federal financial participation" ("FFP").

24.     Medicaid generally follows Medicare as to the medical necessity of inpatient admissions, utilization review, etcetera, in all material respects.

### TRICARE

25.     TRICARE is the component agency of the U.S. Department of Defense that administers and supervises the health care program for certain military personnel and their dependents.

26.     TRICARE contracts with a fiscal intermediary that receives, adjudicates, processes and pays health care claims submitted to it by TRICARE beneficiaries or providers. The funds used to pay the TRICARE claims are government funds.

27.     TRICARE assigns a "provider number" to suppliers who wish to participate in the program. In order to obtain reimbursement for services, the suppliers bill an insurance carrier designated by TRICARE, which insurance carrier in turn ultimately receives payment by funds from the United States.

28.     An explicit tenet of the TRICARE system is that its DRG-based payment system is modeled on the Medicare PPS, and that, whenever practical, the TRICARE system will follow the same rules that apply to the Medicare PPS. See Civilian Health And Medical Program Of the Uniformed Services; Fiscal Year 2004 Diagnosis-Related Group Updates, 68 Fed. Reg. 206, 60970.

## MEDICARE LAW AND REGULATIONS

### Medical Necessity

29.     In addition to compliance with other national or local coverage criteria, Medicare requires as a condition of coverage that services be reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A). Federal law and regulations require that any health care provider who furnishes health care services that may be reimbursed under Medicare, Medicaid or TRICARE must ensure that, to the extent of his or her authority, those services are provided "only when, and to the extent, medically necessary." (42 U.S.C.A. § 1320c-5(a); 42 C.F.R. § 1004.10.) This requirement makes the health care provider the "gatekeeper" who, through the exercise of his or her unbiased medical judgment, plays a critical role in determining what services will be reimbursed with federal funds. In this regard:

   a.  Providers must provide economical medical services and then provide such services only where medically necessary. 42 U.S.C. § 1320c-(a)(1).

b.  Providers must provide evidence that the service is medically necessary as appropriate. 42 U.S.C. § 1320c -5(a)(3).

c.  Providers must ensure that services provided are not substantially in excess of the needs of such patients. 42 U.S.C § 1320a-7(b)(6)&(8).

### Utilization Review

30.     The law imposes specific and extensive obligations on all providers (including hospitals) for assuring that services are medically necessary and supported by evidence of medical necessity. 42 U.S.C. § 1395x(k) requires that hospitals have a utilization review plan that at minimum contains the following four elements:

1. Review, on a sample or other basis, of admissions to the institution, the duration of stays therein, and the professional services (including drugs and biologicals) furnished (A) with respect to the medical necessity of the services, and (B) for the purpose of promoting the most efficient use of available health facilities and services.
2. Review to be made by a committee composed of two or more physicians, with or without participation of other professional personnel.
3. Review, in each case of inpatient hospital services or extended care services furnished to such an individual during a continuous period of extended duration, as may be specified in regulations.
4. Prompt notification to the institution, the individual, and his attending physician of any finding (made after opportunity for consultation to such attending physician) by the physician members of such committee or group that any further stay in the institution is not medically necessary.

31.     Reviews may be conducted on a sample basis, except that the utilization review committee must review all cases reasonably assumed by the hospital to be outlier cases because the extended length of stay exceeds the threshold criteria for the diagnosis. 42 C.F.R. §§ 482.30(c) and (e). Federal regulations detail the requirements further in 42 CFR § 482.30 entitled "Conditions of Participation: Utilization Review."

32.     42 C.F.R. §489.230 permits the hospital to have an agreement with a quality improvement organization (QIO) to perform utilization review. Most hospitals comply with the UR

requirement by means of an agreement with the QIO, and if so, the regulation at 42 CFR 489.230(e) requires a hospital to maintain an agreement with a QIO to review admission, quality, appropriateness and diagnostic information. In this case, there must be a signed and dated agreement.

33.    Hospitals frequently use "level of care criteria" as an objective tool to help make decisions regarding whether an individual's condition is severe enough, or the services provided are intense enough, to be admitted to a specific level of care.  One respected product is called "InterQual," a specific utilization review screening criteria product published by the Payor division of McKesson. Other screening criteria sets used to evaluate admission appropriateness are, for example, Milliman Care Guidelines and MCAP Clinical Review Criteria.

### Inpatient versus Outpatient Determination

34.    There are ample Medicare regulations explaining when inpatient admission is appropriate versus outpatient care. An inpatient requires definitive and a high level of care. Medicare Benefit Policy Manual (CMS Pub. 100-2), ch. 1, § 10 provides:

> An inpatient is a person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services. Generally, a patient is considered an inpatient if formally admitted as an inpatient with the expectation that he or she will remain at least overnight and occupy a bed even though it later develops that the patient can be discharged or transferred to another hospital and not actually use a hospital bed overnight.

35.    CMS identifies procedures that are typically provided only in an inpatient setting, and therefore would not be paid by Medicare under the Outpatient Prospective Payment System (OPPS). These procedures comprise what is referred to as the "inpatient only list." The inpatient only list specifies those services that will only be paid when provided in an inpatient setting because of the nature of the procedure and the need for at least 24 hours of postoperative recovery time or monitoring before the patient can be safely discharged. These procedures are assigned a status code of "C" and hospitals are advised to admit beneficiaries requiring these procedures to receive payment. Each year, CMS, with input from the APC Panel, reviews the inpatient only list using

specific criteria to determine whether any procedures should be moved from the inpatient only list and assigned to an APC (which is the payment system for outpatient procedures). CMS updates the list periodically, in large part to remove procedures from the list that staff determines can now be safely performed on an outpatient basis.

36.     Simply put, outpatient admission is appropriate unless the procedure is on the Medicare Inpatient Only List (explained above), or, if the patient's condition, signs and/or symptoms indicate the need for the more intensive inpatient setting. The medical records should indicate that the patient admitted as an inpatient was individually assessed and that there were comorbidities or other factors meriting an inpatient stay.

37.     Medicare refers to the guidelines for medical necessity for inpatient admission published by InterQual. InterQual guides hospitals to look at the severity of the patient's condition and intensity of the procedures in making the medical necessity determination.

38.     When a hospital, through its credentialing committee, makes the decision to allow patients to be admitted to the hospital, the hospital should consider 1) the severity of the signs and symptoms exhibited by the patient, 2) the medical predictability of something adverse happening to the patient, 3) the need for diagnostic studies that appropriately are outpatient services (i.e., their performance does not ordinarily require the patient to remain at the hospital for 24 hours or more) to assist in assessing whether the patient should be admitted; and 4) the availability of diagnostic procedures at the time when and at the location where the patient presents. Hospital Manual, Ch. II §210 Covered Inpatient Hospital Services.

**Condition Code 44**

39.     In Transmittal 299 (effective date of April 1, 2004), CMS established Condition Code 44 for use by hospitals when billing for services that should have been outpatient in the first instance. For instance, a physician may order a beneficiary to be admitted to an inpatient bed, but upon reviewing the case later, the hospital's utilization review committee determines that an

inpatient level of care does not meet the hospital's admission criteria. The articulated policy set forth in the transmittal is:

> 1. In cases where a hospital utilization review committee determines that an inpatient admission does not meet the hospital's inpatient criteria, the hospital may change the beneficiary's status from inpatient to outpatient and submit an outpatient claim (TOBs 13X, 85X) for medically necessary Medicare Part B services that were furnished to the beneficiary, provided **all** of the following conditions are met:
>
> a. The change in patient status from inpatient to outpatient is made prior to discharge or release, while the beneficiary is still a patient of the hospital;
> b. The hospital has not submitted a claim to Medicare for the inpatient admission;
> c. A physician concurs with the utilization review committee's decision; and
> d. The physician's concurrence with the utilization review committee's decision is documented in the patient's medical record.
> 2. When the hospital has determined that it may submit an outpatient claim according to the conditions described above, the entire episode of care should be treated as though the inpatient admission never occurred and should be billed as an outpatient episode of care.

40.     On August 28, 2009, CMS included minor revisions to those sections of Chapter 1 of the MCPM that relate to Condition Code 44.

> The conditions for the use of Condition Code 44, as stated in section 50.3.2 below, require physician concurrence with the UR committee decision. For Condition Code 44 decisions, in accordance with 42 CFR §482.30(d)(1), one physician member of the UR committee may make the determination for the committee that the inpatient admission is not medically necessary. This physician member of the UR committee must be a different person from the concurring physician, who is the physician responsible for the care of the patient.

### Observation Status versus Inpatient Admission

41.     Observation care is a hospital outpatient service that is reported using HCPCS code G0378 (Hospital observation services, per hour). Hospitals report outpatient observation services, which are commonly provided in association with a hospital clinic visit, emergency department visit, or other major service, on hospital outpatient claims, just like other outpatient services. Physicians order observation care, defined as clinically appropriate services, including ongoing short-term treatment, assessment, and reassessment furnished in order for the physician to determine whether the beneficiary will require further treatment as an inpatient or whether the beneficiary may be safely discharged from the hospital.  It is commonly assigned to patients who

present to the emergency department and require a significant period of treatment or monitoring

before an admission or discharge decision can be made.

> Medicare Benefit Policy Manual (CMS Pub. 100-2), ch. 1 § 70.4.A provides:
> "Observation services are those services furnished by a hospital on the hospital's premises, including use of a bed and periodic monitoring by a hospital's nursing or other staff which are reasonable and necessary to evaluate an outpatient's condition or determine the need for possible admission to the hospital as an inpatient. . . ."

42.     Medicare Claims Processing Manual (CMS Pub. 100-4), ch. 4, § 290.1 repeats the

definition of "observation services" and states that such services usually do not exceed one day,

sometimes may span two days, and "only in rare and exceptional cases" span more than two days.

> As stated by CMS in 65 Fed.Reg. 18434:
> Routinely billing an observation stay for patients recovering from outpatient surgery is not allowed under current Medicare rules nor will it be allowed under the hospital outpatient PPS. As we state in section III.C.5 of this preamble, one of the primary factors we considered as an indicator for the "inpatient only" designation is the need for at least 24 hours of postoperative care.

**Overview of Allegations**

43.     Defendants were repeatedly put on notice that Defendants had poor to non-existent

case management protocols and utilization review processes, such that the foreseeable result would

be a significant number of inpatient admissions that lacked medical necessity. Not only were the

appropriate mechanisms to ensure medical necessity not in place, Defendants created an

environment where protecting revenue was given precedent over compliance and resisted efforts to

put the necessary safeguards in place.

44.     Medicare and Medicaid pays hospitals for inpatient admissions based upon the DRG,

and inclusive in this cost to Medicare and Medicaid is the hospital administrative utilization review

functions required in 42 C.F.R. § 482.30. Defendants knowingly failed to be the medical necessity

gatekeepers of their own hospital doors, resulting in increased costs to Government Healthcare

Programs and putting patients in serious risk of morbidity.  In doing so, Defendants:

a. Submitted claims to Government Healthcare Programs for inpatient admissions without proper internal review sufficient utilization review resulting in patient admissions that lacked medical necessity.

b. Submitted claims to Government Healthcare Programs for inpatient admissions that lacked medical necessity. Oftentimes, these inpatient admissions included procedures and other services that were not medically necessary for financial gain.

c. Submitted claims for outpatient services that were for procedures, or other services that were not medically necessary.

d. Knowingly failed to refund overpayments related to multiple audits when the overpayments were clearly identified.

## Reasons for the Systematic Violations of the False Claims Act

45.     While Defendants have written corporate policies, distributed by Vanguard to all relevant employees, and have articulated corporate policies that are responsible and in compliance with the intent and letter of the law, in truth, the Defendants' practices do not in fact comply. When, for example, allegations or documented evidence of lack of compliance was brought to the attention of Abrazo senior leadership and management, investigation and follow-up was lacking. Even with a formal reporting of widespread violations of the False Claims Act by Relator Hawkins to the Abrazo Compliance Officer as early as 2011, and assurances given to Relator that the issues were being addressed, the fraud and False Claims Act violations described herein continue.

46.     When Relator joined Abrazo Health in 2010, some of the Abrazo Hospitals did not have functioning UR Committees as required by law. Abrazo Health hospitals outsourced secondary review determinations and utilization management to a physician advisor company or, in effect, relied upon Relator Hawkins and her case management team to be the UM Committee rather than having internal physician oversight. At Arrowhead Hospital, a lone hospitalist served the function

as the UM Committee. Even after Relator Hawkins spent years pushing all Abrazo Health hospitals to align with Medicare Utilization Review requirements, some hospitals still do not have a functioning UR Committee, do not review outlier cases, and do not have designated Physician Advisors. In several instances, Relator Hawkins conveyed this information to senior leadership with no relative change in practice. In one instance, Relator Hawkins requested the then Regional CMO, to review some troubling cases and he refused stating he did not do case review.

47.     At all material times, Defendants intentionally and knowingly failed to meet the Utilization Review Condition of Participation as required by 42 U.S.C. § 1395 x(k) and 42 C.F.R. §482.30 in the government programs. Defendants knowingly and falsely certified on multiple occasions that they had met those conditions of participation.

48.     Defendants created a culture within which financial objectives were given strategic priority over ensuring compliance with Government Healthcare Programs and one in which the hospital CFO's  influenced medical decision making for optimal financial gain. The Service Line Committees standards of practiced were developed / reviewed co-chaired by Finance Officers rather than greater involvement of medical practitioners. As the case management leader for the market, Relator was not invited to sit on these committees and in fact had to demand a place at the table.

## SUBSTANTIVE ALLEGATIONS

### A. Claims for Medically Unnecessary One-Day and Other Short Stays

49.     From the six years preceding the filing of Relator's complaint to present, Defendants systematically and routinely submitted claims for inpatient stays that lacked medical necessity. Non-covered hospital admissions usually involved one-day stays, but also included multi-day short stays, from cardiac/vascular cases and surgical cases, to medical cases.

50.     In the instance of West Valley Hospital, the CEO demanded the nursing staff to change any observation admission to inpatient with case management or UM Committee review resulting in an extremely high volume of inappropriate inpatient admissions and false claims. The

case management Director was reportedly "letting some cases go for billing" during the Vanguard required one stay pre-billing review, "because the hospital needed the revenue."

51.    In February 2012, Relator Hawkins notified Vanguard Director of Case Management of the one day stay issue and requested that Senior Vice President of Financial Operations Neal Somaney be made aware of about the high number of inappropriate one-day stays at Abrazo Health hospitals. After several months, Somaney and his EVP of Financial Operations Alan Thomas decided to retain respected internist Dr. Janis Wiener, to conduct an audit of one-day claims submitted by Abrazo Health hospitals during the month of March 2012. Somaney and Thomas presented the results of this audit via the July 24, 2012 PowerPoint titled "Abrazo One Day Stay External Audit Results." The final slide of the presentation revealed a 30% error rate and a "Financial Impact" for this lone month of nearly $1.4 million:

//
//
//
//
//
//
//
//
//
//

# Financial Impact
## (Current status in MS4 7/11/12)
* 19 records in population already written off

|  | Population Cases | Expected Reimb. Population | 20% Sample Cases | Expected Reimb. 20% Sample | Error Rate | Cases in error in 20% sample | Dollars in error in 20% sample | Dollars at risk in population March 2012* |
|---|---|---|---|---|---|---|---|---|
| Abrazo | 780 | $5,729,725 | 154 | $1,214,054 | 30% | 46/154 | $273,438 | $1,367,190 |
| AH | 181 | $1,467,916 | 36 | $290,037 | 17% | 6/36 | $25,620 | $128,100 |
| AZHH | 64 | $702,107 | 12 | $151,818 | 33% | 4/12 | $55,264 | $276,320 |
| PBH | 115 | $776,143 | 23 | $205,986 | 17% | 4/23 | $22,489 | $112,445 |
| PVH | 121 | $787,036 | 24 | $182,018 | 17% | 4/24 | $19,468 | $97,340 |
| WVH | 299 | $1,996,523 | 59 | $384,195 | 48% | 28/59 | $150,597 | $752,985 |

52.     The highest levels of Vanguard and Abrazo Health attended the meeting, including:

- Vanguard Chief Medical Officer Dr. Mark Montoney
- Vanguard VP of HIM Operations Meredith Larsen
- Vanguard EVP of Financial Operations Alan Thomas
- Vanguard SVP of Financial Operations Neal Somaney
- Abrazo Health CFO Stanley McLemore
- Abrazo Health VP of Revenue Cycle Angie Brnovich
- Abrazo Health Director Clinical & Financial Reporting Sheldon Shaw
- Abrazo Health VP of Clinical Transformation Daniel Loch
- Abrazo Health Chief Medical Officer Timothy Jahn

53.     In the aftermath of this one-day stay audit, SVP of Financial Operations Neal Somaney sent an August 17, 2012 email to CFO Stanley McLemore, with copies to Relator Hawkins and others. In this email Mr. Somaney states (in part):

> Also worthy of mention here is that based on the one day stay review conducted, there are some significant operational improvements and education that we need to facilitate to our ED Physicians, Hospitalists, Surgeons for post Anesthesia patients and UM teams in order to prevent denials for incorrect status. We need to very quickly begin addressing these issues. My understanding is that Asja, Stanley, Kathleen and Dr. Dagher have put together a plan to implement some changes to address the gaps that were identified in this area. I look forward to hearing the progress being made in this area as well.

54.     However, even with knowledge of the one-day stay problems reaching the highest levels, no "significant operational improvements" occurred at Abrazo Health hospitals in the near future, and financial objectives continued to trump the needs of Utilization Review despite the diligent efforts of Relator Hawkins to make the required changes.

55.     The lack of medical necessity for one-day stays was particularly prevalent with diagnostic and therapeutic cardiac and peripheral catheterizations, angiograms, neurointerventional angiograms, stents[1], and other cardiac procedures, and hospital administrators were often involved. For instance, Medicare does not cover carotid artery stenting in high surgical risk, asymptomatic patients with stenosis <80%. However, at Arizona Heart, if the medical record reflected stenosis less than 80%, the CEO at Arizona Heart would change or cause to change the medical records to change the percentage from less than 80%, to greater than 80%, to justify carotid stenting procedures.

---

[1] A cardiac stent is a device used to prop open a blocked artery. After cardiologists identify a blockage through cardiac catheterization, they often perform an angioplasty and insert stents (or drug-eluting stents) so blood can pass to damaged or at-risk heart muscle. When CMS implemented the outpatient prospective payment system in 2000, policymakers determined that cardiac stent insertion could be performed on an outpatient basis depending on the circumstances.

56.     Claims for medically unnecessary inpatient stays were most prevalent with cardiac associated cases, but ran the full gamut of patient diagnosis and procedures. They included but are not limited to the following MS-DRGs:

034 Carotid artery stent procedure with MCC
035 Carotid artery stent procedure with CC
036 Carotid artery stent procedure without CC/MCC
166/168 Other respiratory system operating room procedures with MCC, with CC or without CC/MCC (e.g. transbronchial lung biopsy)
167 Other Respiratory System OR Procedures w/CC
168 Other Respiratory System OR Procedures w/o CC/MCC
177 Respiratory Infections & Inflammations w/MCC
178 Respiratory Infections & Inflammations w/CC
179 Respiratory Infections & Inflammations w/o CC/MCC
190/192 Chronic obstructive pulmonary disease (COPD) with MCC, with CC or without CC/MCC
207 Respiratory System diagnosis w ventilator support 96+ hours
208 Respiratory system diagnosis w ventilator support <96 hours
222 Cardiac defibrillator implant with cardiac cath with AMI, heart failure or shock with MCC
223 Cardiac defibrillator implant with cardiac cath with AMI, heart failure or shock without MCC
224 Cardiac defibrillator implant with cardiac cath without AMI, heart failure or shock with MCC
225 Cardiac defibrillator implant with cardiac cath without AMI, heart failure or shock without MCC
226 Cardiac defibrillator implant without cardiac cath with MCC
227 Cardiac defibrillator implant without cardiac cath without MCC
242 Permanent cardiac pacemaker implant with MCC
243 Permanent cardiac pacemaker implant with CC
244 Permanent cardiac pacemaker implant without CC/MCC
246 Percutaneous cardiovascular procedure with drug-eluting stent with MCC or 4+ vessels/stents
247 Percutaneous cardiovascular procedure with drug-eluting stent without MCC
248 Percutaneous cardiovascular procedure with non-drug-eluting stent with MCC or 4+ vessels/stents
249 Percutaneous cardiovascular procedure with non-drug-eluting stent without MCC
250 Percutaneous cardiovascular procedure without coronary artery stent with MCC
251 Percutaneous cardiovascular procedure without coronary artery stent without MCC
264 Other circulatory system operating room procedures
286/287—Circulatory disorders except AMI, with cardiac catheterization with MCC or without MCC

286 Circulatory disorders except acute myocardial infarction, with cardiac catheterization with MCC
287 Circulatory disorders except acute myocardial infarction, with cardiac catheterization without MCC
291/292/293 Heart Failure/Shock w MCC/w CC/wo CC/MCC2 (e.g. congestive heart failure)
313 Chest Pain
343 Appendectomy w/o Complicated Principal Diag w/o CC/MCC
355 Hernia Procedures Except Inguinal & Femoral w/o CC/MCC
377/379 Gastrointestinal hemorrhage with MCC, CC or without CC/MCC
378 G.I. Hemorrhage w/ CC
381 Complicated Peptic Ulcer w/ CC
392 Esophagitis, Gastroent & Misc Digest Disorders w/o MCC
395 Other Digestive System Diagnoses w/o CC/MCC
419 Laparoscopic Cholecystectomy w/o C.D.E. w/o CC/MCC
446 DISORDERS OF THE BILIARY TRACT W/O CC/MCC
463 Wound debridement & skin graft except hand for musculoskeletal connective tissue disease w MCC
464 Wound debridement & skin graft except hand for musculoskeletal connective tissue disease w CC
489 Knee Procedures w/o PDX of Infection w/o CC/MCC
501 Soft Tissue Procedures w/CC
551 Medical Back Problems w/MCC
552 Medical Back Problems w/oMCC
573 Skin graft &/or debridement for skin ulcer or cellulitis w/MC
574 Skin graft &/or debridement for skin ulcer or cellulitis w/CC
575 Skin graft &/or debridement for skin ulcer or cellulitis w/o CC/MCC
581 Other Skin, Subcut Tiss & Breast Proc w/o CC/MCC
627 Thyroid, Parathyroid & Thyroglossal Procedures w/o CC/MCC
640/641 Nutritional & Metabolic disorders wMCC/woMCC (correct coding) (e.g. dehydration)
669 Transurethral Procedures w/CC
675 Other Kidney & Urinary Tract Procedures w/o CC/MCC
682/684 Renal failure with MCC, with CC or without CC/MCC
689/690 Kidney and urinary tract infections with MCC or without MCC
694 Urinary Stones w/o Esw Lithotripsy w/o MCC
714 Transurethral Prostatectomy w/o CC/MCC
730 Other Male Reproductive System Diagnoses w/o CC/MCC
748 Female Reproductive System Reconstructive Procedures
811/812 Red blood cell disorders with MCC or without MCC
853 Infectious & parasitic diseases w OR procedure w/MCC
854 Infectious & parasitic diseases w OR procedure w/CC
855 Infectious & parasitic diseases w OR procedure w/o CC/MCC
870 Septicemia w MV 96+ hours
871 Septicemia w/o MV 96+ hours w/MCC

872 Septicemia w/o MV 96+ hours w/o MCC
981 Extensive OR procedure unrelated to principal diagnosis w/MCC
982 Extensive OR procedure unrelated to principal diagnosis w/CC
983 Extensive OR procedure unrelated to principal diagnosis w/oCC/MCC

57.     Relator is also aware of medically unnecessary procedures occurring on an outpatient basis. These occurred most commonly with physicians doing percutaneous cardiac, vascular and neurovascular procedures (with and without therapy, such as stents or balloons or medicine).

    a.   For example, numerous angiograms were conducted even after negative stress tests and other negative diagnostic indicators. In one instance during a medical record claims / denials review with a payer Medical Director, Relator was told that Abrazo cardiologists were performing procedures on patients that did not need them. Relator was aware of this, pointing to a case in which the treadmill was negative and the subsequent cardiac catheterization was negative.

    b.   Catheterizations were also a common procedure performed on unknowing patients without medical necessity. In fact, at Abrazo Health, the negative catheterization rate in comparison to national benchmarks, were significantly higher.

    c.   Computed tomography (CT) scans were commonly ordered without appropriate medical necessity. This practice, in particular, endangered patients of all ages due to the unnecessary radiation.

58.     The decision of whether to admit a patient, treat the patient in observation status, or discharge the patient has significant financial ramifications for the hospital. Hospitals generally derive the bulk of their revenues from payments for inpatient care and cardiac procedures top the list of financially lucrative admissions. Hospitals are paid thousands of dollars more by Medicare to treat a patient who has been billed as an admitted inpatient than one who has been billed as an outpatient or as a patient under observation.

59.    The Medicare Program Integrity Manual provides that "[i]npatient care, rather than outpatient care, is required only if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care was provided in a less intensive setting." Chapter 6, Section 6.5.2.

60.    From a medical standpoint, it is especially important that physicians hospitalize elderly persons only when inpatient treatment is essential to the well-being of the patient. Hospitalization poses significant physical, psychological and emotional risks for the elderly. Older people generally have more compromised immune systems and therefore are far more susceptible to hospital-acquired infections. Older adults also are more likely to experience adverse drug reactions during hospitalization, because they are more susceptible to the side effects of many drugs and are often treated with multiple medications. Another serious risk factor for the elderly patient is hospital delirium – a condition which according to the *American Geriatrics Society* affects 1 in 3 hospitalized patients over age 70. Patients who experience hospital delirium usually have extended hospital stays and are at an elevated risk to being placed in a nursing home, experiencing falls, dementia or death. With cardiac procedures in particular, the elderly with co-morbid conditions, such as renal insufficiency or failure, are especially vulnerable to the effects of dye/contrast used in many of the unnecessary cardiac procedures.

61.    When patients are improperly admitted as inpatients rather than treated as outpatients, the charges included in the hospital's interim payment claims and in cost reports are unlawfully increased.

62.    Both Medicare and Medicaid programs rely on physicians to exercise their unbiased medical judgment in determining whether a patient should be hospitalized or treated on an outpatient basis.

**Failure to Refund Known Overpayments**

63.    Defendants have been on notice that they have been admitting patients as inpatients without medical necessity, a practice that has led to multiple instances of overpayment, of which

Defendant has a duty to disclose. Hospitals enrolled in Government Healthcare Programs have long reconciled and returned overpayments through various ongoing and post-payment audit and self-disclosure mechanisms. Defendants however, in violation of 31 U.S.C. §3729 (a)(1)(G) knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the Government.[2] In doing so, Defendants also violated the Patient Protection and Affordable Care Act of 2010 (PPACA), Pub. L. 111-148, 124 Stat. 119 (2010), and Health Care and Education Affordability Reconciliation Act, Pub. L. 111-152, 124 Stat. 1029 (2011) (collectively referred to as "PPACA"). In accordance therewith, on March 23, 2010, Congress injected a 60-day timeline upon which providers and suppliers (receiving government funds, such as Medicare and Medicaid reimbursements), must report and refund government "overpayments" they have received. The provision, 42 U.S.C. §1320a-7k(d)(2) provides:

> An overpayment must be reported and returned... by the later of –
>
> (A)    the date which is 60 days after the date on which the overpayment was identified; or
> (B)    the date any corresponding cost report is due, if applicable.

64.    PPACA was clear that an overpayment retained after the deadline for reporting and returning and overpayment is considered an obligation, for purposes of "reverse" false claims liability under the FCA. To avoid inconsistent, narrow interpretations of the term "overpayment," Congress broadly defined "overpayment" to mean "any funds that a person receives or retains under" Medicare or Medicaid to which the person, "after applicable reconciliation, is not entitled." 42 U.S.C. §1320a-7k(d)(4)(B).

65.    In February 2012, Relator Hawkins elevated her concerns to then Abrazo Health's parent company, Vanguard, by contacting Senior Vice President of Financial Operations Neal Somaney. By June 2012, Somaney had determined that Relator's concerns were worthy of an

---

[2] The FCA, as amended in 2009, has no presentment and no specific identification of claims required.

extensive audit, and Relator, as a McKesson-certified InterQual reviewer with a national reputation as an expert reviewer, should oversee the audit.

66.    The audit purported to review all 2,945 one-stay claims submitted to Medicare Part A from January 1, 2011 through March 31, 2013.[3] Relator Hawkins drafted an overview of the planned audit, which was later adopted by her supervisor. In effect, the audit was three separate audits, for they looked at three categories of cases: Medical (1,833 cases), Cardiac (591 cases), and Surgical/GI (521 cases).

67.    By summer 2014, the audit results showed error rates that fully corroborated Relator Hawkins' concerns that Defendants had been routinely submitting inappropriate one-day stay claims to Government Healthcare Programs: Medical (17.5% error rate), Cardiac (59.2% error rate), and Surgical/GI (30% error rate). Defendants have not returned all of these identified funds to the government and are unlikely to do so in the future.

68.    Multiple internal audits resulted in specific, definitive, and ascertainable overpayments known to Defendant to be owed to Government Healthcare Programs.

## COUNT ONE: Knowingly Causing False Claims to be Presented
### [31 U.S.C. § 3729(a)(1)(B)] [31 U.S.C. § 3729(a)(2)]

69.    Plaintiff re-alleges and avers the allegations contained in paragraphs 1 through 68, as if fully set forth herein. This Count is a civil action against defendants for violating 31 U.S.C. § 3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(2) (pre-May 2009 amendment).

70.    By engaging in the conduct set forth herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C.

---

[3] There were originally nearly 4,000 claims for one-day stays during this time period, but Neal Somaney made the decision to remove approximately 900 claims that had been previously deemed appropriate by secondary review company Executive Health Resources (EHR). Relator believes that a percentage of these 900 claims are medically unnecessary, so the audit results are deflated.

§ 3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. § 3729(a)(2) (pre-May 2009 amendment).

71.     Because of Defendants' conduct under this Count, the United States has suffered substantial actual damages.

## COUNT TWO: False Statements or Records
### [31 U.S.C. §3729(a)(1)(B)] [31 U.S.C. §3729 (a)(2)]

72.     Plaintiff re-alleges and avers the allegations contained in paragraphs 1 through 68, as if fully set forth herein. This Count is a civil action against defendants for violating 31 U.S.C. §3729(a)(1)(B) (post-May 2009 amendment) and 31 U.S.C. §3729 (a)(2) (pre-May 2009 amendment).

73.     By engaging in the conduct set forth herein, Defendants have knowingly caused to be made or used, false records or statements material to false or fraudulent claims, within the meaning of § 3729.

74.     Because of Defendants' conduct under this Count, the United States has suffered substantial actual damages.

## COUNT THREE: Conspiracy to Violate False Claims Act
### [31 U.S.C. §3729(a)(1)(C)] [31 U.S.C. §3729 (a)(3)]

75.     Plaintiff re-alleges and avers the allegations contained in paragraphs 1 through 68, as if fully set forth herein. This Count is a civil action against defendants for violating 31 U.S.C. §3729(a)(1)(C) (post-May 2009 amendment) and 31 U.S.C. §3729 (a)(3) (pre-May 2009 amendment).

76.     Defendants have conspired with one another and others to present false or fraudulent claims for payment and to make false records and statements material to false or fraudulent claims.

77.     Because of Defendants' conduct under this Count, the United States has suffered substantial actual damages.

### COUNT FOUR: False Claims Act Anti-Retaliation Provision

#### 31 U.S.C. § 3730(h)

78.     Plaintiff Kathleen Hawkins re-alleges and avers the allegations made in Paragraphs 1 through 68, as if fully set forth herein.

79.     Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against individuals who take lawful actions in furtherance of a False Claims Act action, or who take actions to stop violations of the False Claims Act.

80.     Relator took lawful actions to stop violations of the False Claims Act, and in furtherance of a False Claims Act action, including but not limited to investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws. In addition, by raising the issues identified in this complaint to the highest levels of Defendants, she took proactive steps to stop the continued filings of claims to Government Healthcare Programs that were violative of the False Claims Act.

81.     Since 2012, Defendants harassed and/or discriminated against Relator in the terms and conditions of employment. As she attempted to fulfill her responsibilities as the Vice President of Case Management and, later, as Senior Specialist Case Management, she uncovered system-wide problems with medically unnecessary procedures and inpatient admissions that crossed multiple service lines and providers. When Relator encouraged Defendants to assess and address the underlying problems, senior management publicly chastised her in front of her direct reports and colleagues and portrayed her as incompetent. CFOs of some Abrazo Hospitals blamed Relator for "denying" inpatient claims by not submitting them to Medicare for payment, even when they knew the claims were ineligible for payment.

82.     Even so, because of Relator's unrelenting efforts, Defendants' Executive and Senior Vice Presidents of Financial Operations finally agreed to conduct an extensive audit in 2012, overseen by Relator. In the summer of 2014, the final results of this audit were presented to Defendants' senior leadership, fully corroborating Relator's long-shared knowledge that Defendants were routinely submitting improper claims to Medicare. Instead of acknowledging Relator for her efforts in assessing the problem, Defendants have since largely isolated Relator, cutting her off from any actual job responsibilities and in fact making changes to how the cardiac portion of the audit was completed without her involvement or knowledge. Today, Relator Hawkins finds herself in a job with no responsibilities, no direct reports, and no purpose and no integration with the rest of the team.

83.     Relator was discriminated against in the terms and conditions of her employment by Defendants, by and through its officers, agents, and employees because of lawful acts done by her in the furtherance of her efforts to bring a False Claims Act action and to stop violations of the False Claims Act.

84.     The actions of Defendants damaged and will continue to damage Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

85.     Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of her reputation and the pursuit of her retaliation claims.

Dated: December 12, 2014.

By:      _____
         David I. Weissman, Esq.
         dweissman@roselawgroup.com
         Christopher B. Ingle, Esq.
         cingle@roselawgroup.com
         **ROSE LAW GROUP PC**
         7144 E. Stetson Drive, Suite 300
         Scottsdale Arizona 85251
         Telephone: (480) 505-3936
         Facsimile: (480) 505-3925

1  
2  
3  
4  
5  
6  

Kenneth J. Nolan, Esq.
Marcella Auerbach, Esq.
Joseph E. B. White, Esq.
**NOLAN AUERBACH & WHITE, P.L.**
435 N.  Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Telephone: (954) 779 3943
Facsimile: (954) 779-3937

7  
8  
9  
10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25  
26  
27  
28